UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

GREGORY PYLES, ADMINISTRATOR
OF THE ESTATE OF JACQUELINE V. PYLES,

      Plaintiff,

v.                                 Civil Action No. 2:23-CV-0354

PRIMECARE MEDICAL OF WEST VIRGINIA, INC.
and WEST VIRGINIA DIVISION OF CORRECTIONS
AND REHABILITATION,

      Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff, Gregory Pyles, as Administrator of the Estate of Jacqueline V. Pyles, by and through undersigned counsel, Calwell Luce diTrapano, PLLC, Forbes Law Offices, PLLC, and John & Werner Law Offices, PLLC, brings this civil action against the defendants PrimeCare Medical of West Virginia, Inc. and WestVirginia Division of Corrections and Rehabilitation. Plaintiff alleges as follows:

### PARTIES

1. Jacqueline V. Pyles was a resident of Marion County, West Virginia prior to and atthe time of her death on October 18, 2021.

2. Plaintiff Gregory Pyles is the father of Jacqueline V. Pyles. At all relevant times tothis action, Gregory Pyles has been a citizen and resident of Marion County, West Virginia. Plaintiff was lawfully appointed by the Fiduciary Supervisor of the Marion County Commission as Administrator of the Estate of Jacqueline V. Pyles on December 6, 2021.

3. Defendant PrimeCare Medical of West Virginia, Inc. ("PrimeCare") is a West Virginia Corporation created under the laws of the State of West Virginia and chartered therein,

1

which provides health care services to inmates at facilities run by the West Virginia Division of Corrections and Rehabilitation, including North Central Regional Jail in Doddridge County, West Virginia.

4. Defendant West Virginia Division of Corrections and Rehabilitation ("WVDCR") is a West Virginia State Agency with the West Virginia Division of Military Affairs and Public Safety charged with the legal responsibility to operate, manage, supervise and control the North Central Regional Jail ("NCRJ") located in Doddridge County, West Virginia.

## JURISDICTION, EXPRESSED FEDERAL LAW DISCLAIMERS, AND VENUE

5. This action seeks damages for violations of the common law and statutes of the State of West Virginia.

6. Pursuant to W.Va. Code §55-17-3, notice of this action has been properly served upon the chief officer for the government agency Defendant WVDCR and the office of the West Virginia Attorney General, and the Notice specifies:

> The claims brought will be for wrongful death, negligence, failure to provide appropriate medical care, failure to follow proper procedures to prevent injury, and all other available claims <u>under West Virginia law</u>….(underline added.)

7. This second amended complaint asserts only causes of action which are based on West Virginia law. No federal law-based cause of action is presented and reliance upon 42 U.S.C. §1983 is expressly disclaimed.

8. Pursuant to W.Va. Code §55-7B-6, a notice of claim relating to the medical professional negligence cause of action encompassed by this Complaint was properly served upon Defendant PrimeCare.

9. All statutory prerequisites to the commencement and prosecution of this civil action have been satisfied.

10. Jurisdiction is proper in the Circuit Court of Kanawha County, West Virginia, pursuant to W.Va. Code §51-2-2, and all applicable West Virginia law, because the acts and conduct giving rise to this complaint either occurred in this county, the defendants are either residents of this county, do business in the county, or are otherwise properly within the jurisdiction of this court.

11. Venue for this action properly lies in Kanawha County under W. Va. Code §14-2-2.

## FACTUAL ALLEGATIONS

12. On or about October 13, 2021, Jacqueline V. Pyles was incarcerated at North Central Regional Jail ("NCRJ"), Doddridge County, West Virginia.

13. Upon arrival at the NCRJ, Ms. Pyles was processed through the intake screening process. The intake screening process is documented in CorEMR, an electronic correctional health record system.

14. Ms. Pyles's intake evaluation was based on an assessment of her physical condition at booking and on the responses she gave to standard semi-structured survey questions. Her responses were recorded, scored, and entered into CorEMR by the responsible staff member.

15. During Ms. Pyles's intake, incarceration, psychiatric evaluation, care, and treatment while at North Central Regional Jail and Correctional Facility from October 13, 2021, until her death on October 18, 2021, it appears none of Ms. Pyles's reported of signs and symptoms of depression and anxiety provided to intake and mental health staff, her report of suicidal ideation to Dr. Andrea Huffman, her self-harm and placement in restraints, her admission of past suicidal

3

ideation and suicide attempt to Ms. Kandi Shafer, her admission of chronic hallucinations and paranoia to Ms. JoyAnne James and Ms. James diagnosing her with a psychotic disorder, Ms. James' and Ms. Audra Glunt's prescriptions of antipsychotics and antidepressants to Ms. Pyles, documentation of her treatment with many antidepressants and antipsychotics by providers in the community, or her worrisome report in suicide and mental health screens were ever taken into consideration during the intake screen of Ms. Pyles on her final incarceration October 2021.

16. The readily available PrimeCare records clearly demonstrated the fragile state of Ms. Pyles's mental health, her need to see a psychiatrist, and her high risk of self-harm when she was incarcerated October 13, 2021.

17. Ms. Alexis Losh and Ms. Amy Childers failed to heed these significant factors and did not refer Ms. Pyles for urgent assessment by a mental health provider.

18. Instead, during Ms. Pyles' October 2021 incarceration PrimeCare staff relied solely on cursory intake screening to conclude she did not require close or careful observation, suicide prevention or even a mental health assessment. Despite the abundant evidence of severe mental illness clearly documented during her many prior incarcerations, Alexis Losh, MA and Amy Childers, CMA relied solely on their standard intake assessment screens and solely on Ms. Pyles' report.

19. The reasonably prudent clinician and mental health staff member recognizes the high likelihood an inmate with severe mental illness will be reticent to provide honest or complete answers, either from distrust, shame, embarrassment, poor judgment or lack of insight, which mandates obtaining collateral information.

20. In her October 14, 2021 suicide screen, Alexis Losh MA erroneously documented no history of mental health treatment and no history of previous suicide attempts.

21. As a result of her error, the intake suicide screen was faulty and ineffective. Furthermore, Ms. Losh inexplicably and inexcusably documented at 5:17 PM "denied any health issues other than back pain," despite abundant evidence in the records Ms. Pyles suffered from severe mental illness.

22. Ms. Losh had noted at the beginning of her intake screen there was a history of psychological medication and mental health assessments during prior incarceration, which included "suicidal" July 14, 2017, psychological/mental health July 17, 2017, psychological/medication August 15, 2017, yet clearly failed to review or consider this necessary information.

23. It had been clearly documented in the records that Ms. Pyles had been on psychotropics in the past and seen a psychiatrist before, had been self-injurious and required placement in a restraint chair in 2017, had been hallucinating and delusional and required antipsychotic treatment in 2019, and in April 2021 was experiencing significant mood and anxiety problems and repeatedly had requested to see a mental health provider.

24. Furthermore, Ms. Pyles admitted to Ms. Losh she had a miscarriage two months prior, which undoubtedly would constitute a significant recent loss, and this was her sixth incarceration and her substance use disorder was clearly severe and progressively worsening.

25. The reasonably prudent health provider would have recognized all these factors necessitated an urgent referral to a mental health provider, yet this went unnoticed and unaddressed by Ms. Losh and Ms. Childers.

26. It is a gross deviation from the standard of care for PrimeCare to rely solely on medical assistants to assess risk in an individual with known severe mental illness.

27. Evidently Ms. Losh and Ms. Childers lack the training and experience to do so andscreening tests by themselves are inadequate gauges of symptoms and risk in a severely mentally ill individual.

28. Due to the necessary knowledge, training and experience required, appropriate assessment of illness and determination of risk and proper treatment can only be accomplished bya mental health professional.

29. This fact is evidenced by the times Ms. Pyles was cleared for general population bymedical assistants yet subsequently proved greatly ill and self-injurious and when assessed by medical or mental health professionals much more information was obtained than was ever captured in the cursory questions posed by undertrained and inexperienced medical assistants.

30. Dr. Huffman elicited suicidal ideation, Ms. Shafer twice recognized Ms. Pyles needed to see a psychiatrist, and Ms. James elicited years of hallucinations and delusions and a diagnosis of psychosis.

31. When Ms. Pyles presented to NCRJ on October 14, 2021, the record available to PrimeCare staff contained clear evidence Ms. Pyles had severe mental illness that should have guided intake staff to generate an immediate referral for a timely evaluation by a mental health and not accept at face value a denial of signs or symptoms of her underlying severe mood, anxiety, and psychotic disorder.

32. Instead, tragically and inexcusably, Ms. Childers and Ms. Losh failed to comply with the standard of care and Ms. Pyles was allowed to suffer and die.

33. Furthermore, in gross deviation from the standard of care, when Christine Merrill, FNP saw Ms. Pyles on sick call on October 15, 2021, she failed to identify the purpose of the visit, wrote a cursory note, performed no exam, asked no questions regarding her mental health, and made no change in her treatment plan.

34. Her lack of attention and care to a patient with well documented severe mental illness was egregious, inexplicable, and indefensible.

35. The standard of care demanded Ms. Merrill conduct a detailed assessment of her mental state, which at a minimum would require assessing DSM-5 symptoms of a major depressive episode (SIGECAPS), exploring for mania or hypomania, exploring for auditory and visual hallucinations and delusions, asking about command hallucinations, asking about past and present suicidal and homicidal ideation, and exploring family history of mental illness.

36. With a caring and determined approach, even a private and reluctant patient will be coaxed into revealing much necessary information and, failing this, contacting family will facilitate a complete evaluation.

37. If Ms. Merrill had been diligent in exploring her mental health, she would have discovered clear evidence of severe psychiatric illness, including mood, anxiety, and psychotic disorders and suicidality.

38. Instead, Ms. Merrill failed to conduct any evaluation and missed the opportunity to provide life-saving treatment. Per Chapter 23 (Emergency Psychiatric Medicine) of Kaplan and Sadock, most suicides are preventable and inadequate assessment and treatment is often associated with suicide. "Inevitable suicides" are uncommon, and often defined as patients with prolonged suffering who failed to respond to long-term treatment.

39. The evaluation for suicide potential necessarily involves a complete psychiatric history, a thorough assessment of mental state, identification and exploration of recent losses, detailed assessment of family history of mental illness and, crucially, exploration of family history of suicide attempts or completions, and questions regarding suicidal ideation, plan, intent, past suicidal thoughts and attempts and opposition/obstacles to self-harm. In a gross deviation from the standard of care, when Jacqueline Pyles was incarcerated October 14, 2021, this did not occur.

40. The records maintained by PrimeCare Medical of West Virginia, Inc. fall below the standard of care and cast doubt on the reliability of anything documented. The MAR claims that she received magnesium oxide from October 15, 2021 until October 21, 2021 and received a total of seven doses.

41. It similarly makes the same claim about multivitamin, documenting daily administration until October 21, 2021, with a total of seven doses given. Gatorade was documented as being dispensed twice a day until October 20, 2021, with a total of 10 doses delivered. Folic acid was given from October 15 to October 21 for a total of seven doses.

42. Pepto-Bismol was documented as being administered twice daily until October 21, 2021, for a total of 14 doses. Thiamine was administered daily until October 21, 2021, for a total of seven doses. This is inexplicable given she died on October 18, 2021, and casts significant doubt on the veracity of any of the documentation by the medical staff.

43. On October 18, 2021, at 11:50 p.m. Ms. Pyles was found with a torn bedsheet around her neck hanging from the cement table in her cell. Her death certificate indicates she died at NCRJ and lists her cause of death as "Hanging."

## COUNT I: MEDICAL NEGLIGENCE – <br> PRIMECARE MEDICAL OF WEST VIRGINIA, INC.

44. Plaintiff re-alleges and incorporates by reference, as if is fully set forth herein, all the allegations contained in the above paragraphs of this second amended complaint.

45. Upon information and belief, PrimeCare Medical of West Virginia, Inc. ("PrimeCare") was, at all times relevant, an employer in fact and under the law.

46. Defendant PrimeCare employs Alexis Losh, MA, Amy Childers, CMA, and Christine Merrill, FNP, and is therefore vicariously liable for the negligent and otherwise tortious conduct of its employees.

47. Pursuant to West Virginia Code §55-7B-6(c), no separate screening certificate of merit is required for this claim, as the existence of an employer-employee relationship does not require proof by expert testimony.

48. Defendant PrimeCare owed a duty to Ms. Pyles to skillfully, prudently, and thoroughly diagnose, care, treat, advise, and observe her in such a manner as would a reasonably prudent medical care provider who was confronted with and by similar conditions and circumstances.

49. Defendant PrimeCare breached this duty of care and was guilty of negligent conduct by negligently and improperly treating Jacqueline V. Pyles. Defendant PrimeCare failed to exercise the degree of care, skill, and learning required or expected of reasonable, prudent health care providers acting in same or similar circumstances, all in violation of the applicable standards of care.

50. Defendant PrimeCare failed to properly treat and monitor Ms. Pyles's condition and created a situation where death by suicide was clearly foreseeable as a result of its negligent conduct.

51. Defendant PrimeCare failed to properly treat plaintiff, failed to properly examine and evaluate Ms. Pyles, failed to properly examine the medical records to which they had access, and improperly and negligently failed to monitor Ms. Pyles's detoxification.

52. Defendant PrimeCare was further guilty of medical negligence including but not limited to the following:

   a. Failed, despite the availability of the decedent as a historian and despite being in actual possession of medical records disclosing the decedent's mental health history and diagnosis, to take a proper history and to properly review treatment records in assessing the decedent's mental health;

   b. Failed to ensure that appropriate mental health treatment and care were provided to decedent on an ongoing basis;

   c. Failed to conduct proper and complete examinations of the decedent which examinations would have disclosed decedent's mental health condition;

   d. Failed to properly observe, recognize, and report the condition of the decedent;

   e. Failed to conduct such tests and examinations as were necessary to the proper care of the decedent;

   f. Failed to provide decedent with reasonably prudent and proper medical care, treatment, and services after defendants knew of or should have known of the decedent's condition;

   g. Failed to perform a psychiatric evaluation or complete a suicide risk assessment despite a multitude of risk factors;

   h. PrimeCare failed to explore the many warning signs of decedent's heightened risk of suicide and PrimeCare's evaluation was inappropriately conducted.

53. It appears, upon information and belief, that PrimeCare was negligent in respect to its training and supervision of its employees in permitting these basic violations of the standard of care, none of which are likely to occur in an isolated case without warning signs indicating a lack of care, skill, or knowledge in other cases.

54. As a direct and proximate result of the negligence of PrimeCare and its employees, Ms. Pyles committed suicide. Ms. Pyles also endured substantial pain and suffering, during her incarceration, as a consequence of defendant's malpractice and breach of the standards of care.

**WHEREFORE**, Plaintiff Gregory Pyles, as Administrator of the Estate of Jacqueline V. Pyles respectfully demands that he be awarded judgment against the Defendant in an amount to fully compensate him for his losses, including but not limited to plaintiff's pain andsuffering, medical expenses, and all other losses recoverable in law, including punitive damages, if allowed by law, together with prejudgment and post-judgment interest, costs expended in the prosecution of this lawsuit, including reasonable attorneys' fees, and for such other and further reliefas the Court may deem proper.

### COUNT II: NEGLIGENT TRAINING AND SUPERVISION - PRIMECARE MEDICAL OF WEST VIRGINIA, INC.

55. Plaintiff re-alleges and incorporates by reference, as if is fully set forth herein, all the allegations contained in the above paragraphs of this second amended complaint.

56. Defendant PrimeCare was negligent in the training and/or supervision of its employees, representatives, and agents that caused or contributed to the inadequate care and ultimate death of Jacqueline V. Pyles.

57. Defendant failed to properly supervise Alexis Losh, MA, Amy Childers, CMA, Christine Merrill, FNP and other employees, representatives and agents ensure that they would not create an unsafe environment for Jacqueline V. Pyles and to ensure that the negligent and tortious conditions described in this complaint would not occur.

58. Defendant is vicariously and strictly liable for all negligence, medical professional negligence, tortious conduct, and actions/inactions of its employees, representatives and agents that contributed to or caused the injuries and death of Jacqueline V. Pyles and damages to Plaintiff.

59. As a proximate result of Defendants actions, Jacqueline V. Pyles committed suicide, for which Plaintiff should be compensated.

60. Consequently, Plaintiff seeks to recover damages for the pain and suffering and death of Ms. Pyles, which were proximately caused by Defendant.

61. Defendant's actions were willful, wanton, and/or undertaken with reckless disregard and/or reckless indifference to the rights of Jacqueline V. Pyles, entitling Plaintiff to punitive damages in an amount to be determined by the jury.

**WHEREFORE**, Plaintiff Gregory Pyles, as Administrator of the Estate of Jacqueline V. Pyles respectfully demands that he be awarded judgment against Defendant in an amount to fully compensate him for his losses, including but not limited to plaintiff's pain and suffering, medical expenses, and all other losses recoverable in law, including punitive damages, if allowed by law, together with prejudgment and post-judgment interest, his costs expended in theprosecution of this lawsuit, including reasonable attorneys' fees, and for such other and further reliefas the Court may deem proper.

### COUNT III: DELIBERATE INDIFFERENCE IN VIOLATION OFCLEARLY ESTABLISHED WEST VIRGINIA LAW - <u>WEST VIRGINIA DIVISION OF CORRECTIONS AND REHABILITATION</u>

62. Plaintiff re-alleges and incorporates by reference, as if is fully set forth herein, all the allegations contained in the above paragraphs of this second amended complaint.

63. Corrections officers employed by Defendant WVDCR had actual and constructive knowledge of Jacqueline Pyles's mental health condition from their regular interactions with Ms. Pyles as an inmate, and from Ms. Pyles's clearly documented mental health condition that was available to and known by Defendant's employees at NCRJ.

64. In addition to the knowledge described above, Ms. Pyles's physical condition and behaviors during her five-day incarceration at NCRJ displayed an urgent need for mental health care that was obvious to any reasonable and reasonably trained corrections officer.

65. Ms. Pyles's urgent need for appropriate mental health care presented a substantial risk of serious harm to Ms. Pyles if appropriate care was not provided.

66. Despite having actual and constructive knowledge of Jacqueline Pyles's mental health condition, and despite observing Ms. Pyles's physical condition and behaviors that displayed an obvious urgent need for mental health care, WVDCR's employees acted with deliberate indifference to Ms. Pyles's medical needs and the accompanying substantial risk of serious harm to Ms. Pyles.

67. Article III, Section 5 of the West Virginia Constitution prohibits "cruel and unusual punishment." Article III, Section 10 of the West Virginia Constitution provides: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

68. Defendant West Virginia Division of Corrections and Rehabilitation, through its employees and officials, who were acting in their capacity as state officials and employees of WVDCR, clearly violated the prohibitions in the West Virginia Constitution against cruel and unusual punishment and the deprivation of life without due process and a jury trial by failing to properly monitor and provide appropriate medical care for Ms. Pyles during her incarceration at NCRJ.

69. Defendant WVDCR's deliberate indifference to the substantial risk of serious harm presented by Ms. Pyles's known and obvious need for mental health care was the direct and proximate cause of Ms. Pyles's death at NCRJ.

70. Plaintiff only seeks to recover damages from Defendant WVDCR up to but not exceeding the limits of WVDCR's applicable insurance coverage.

**WHEREFORE**, Plaintiff Gregory Pyles, as Administrator of the Estate of Jacqueline V. Pyles respectfully demands that he be awarded judgment against the Defendant in an amount to fully compensate him for his losses, only up to the limits of the applicable insurance coverage, including but not limited to plaintiff's pain and suffering, medical expenses, and all otherlosses recoverable in law, including punitive damages, if allowed by law, together with prejudgment and post-judgment interest, costs expended in the prosecution of this lawsuit, including reasonable attorneys' fees, and for such other and further relief as the Court may deem proper.

### COUNT IV: NEGLIGENCE - WEST VIRGINIA DIVISION OF CORRECTIONS AND REHABILITATION

71. Plaintiff re-alleges and incorporates by reference, as if is fully set forth herein, all the allegations contained in the above paragraphs of this second amended complaint.

72. Defendant WVDCR's employees were subject to various policies, procedures, and protocols regarding the identification of, and care for, an inmate in mental health crisis. Defendant had a legal duty to comply with those policies and to otherwise provide proper medical care to Ms. Pyles.

73. Defendant's employees were aware of Ms. Pyles's mental health conditions and the imminent risks associated with failing to provide proper medical care for those conditions.

74. Defendant's employees failed to follow the applicable policies, procedures, and protocols by failing to provide or obtain proper medical care for Ms. Pyles.

75. The actions and failures to act by Defendant's employees at NCRJ proximately caused the injuries and subsequent death of Ms. Pyles.

76. Defendant WVDCR is liable for the negligent acts and omissions of its employees, and for their violations of clearly established duties under the law, up to the limits of the applicable insurance coverage.

77. Plaintiff only seeks to recover damages from Defendant WVDCR up to but not exceeding the limits of WVDCR's applicable insurance coverage.

**WHEREFORE**, Plaintiff Gregory Pyles, as Administrator of the Estate of Jacqueline V. Pyles respectfully demands that he be awarded judgment against the Defendant in an amount to fully compensate him for his losses, only up to the limits of the applicable insurance coverage, including but not limited to plaintiff's pain and suffering, medical expenses, and all otherlosses recoverable in law, including punitive damages, if allowed by law, together with prejudgment and post-judgment interest, costs expended in the prosecution of this lawsuit,including reasonable attorneys' fees, and for such other and further relief as the Court may deem proper.

### COUNT V:  NEGLIGENT TRAINING - WEST VIRGINIA DIVISION OF CORRECTIONS AND REHABILITATION

78. Plaintiff re-alleges and incorporates by reference, as if is fully set forth herein, all the allegations contained in the above paragraphs of this second amended complaint.

79. Defendant WVDCR had a legal duty to properly train its employees to recognize when an inmate is exhibiting an obvious mental health crisis or an obvious need for mental health care, and to otherwise provide or obtain proper medical care to inmates including Ms. Pyles.

80. Defendant WVDCR failed to properly train its employees at NCRJ to recognize when an inmate is exhibiting an obvious mental health crisis or an obvious need for mental health care.

81. As a proximate result of Defendant's negligent training, Defendant's employees at NCRJ failed to recognize Ms. Pyles's obvious need for mental health care and failed to otherwise identify the medical needs of, and obtain or provide proper treatment for, Ms. Pyles.

82. As a proximate result of Defendant's negligent training, Ms. Pyles was denied proper mental health care, which caused the injuries and subsequent death of Ms. Pyles.

83. Defendant WVDCR is liable for its negligence, the negligent acts and omissions of its employees, and for their violations of clearly established duties under the law, up to the limits of the applicable insurance coverage.

84. Plaintiff only seeks to recover damages from Defendant WVDCR up to but not exceeding the limits of WVDCR's applicable insurance coverage.

**WHEREFORE**, Plaintiff Gregory Pyles, as Administrator of the Estate of Jacqueline V. Pyles respectfully demands that he be awarded judgment against the Defendant in an amount to fully compensate him for his losses, only up to the limits of the applicable insurance coverage, including but not limited to plaintiff's pain and suffering, medical expenses, and all other losses recoverable in law, including punitive damages, if allowed by law, together with prejudgment and post-judgment interest, costs expended in the prosecution of this lawsuit, including reasonable attorneys' fees, and for such other and further relief as the Court may deem proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Gregory Pyles, as Administrator of the Estate of Jacqueline V. Pyles respectfully demands that he be awarded judgment and that he and Ms. Pyles's wrongful death beneficiaries be awarded damages for the following:

    a. Ms. Pyles's pain and suffering prior to her death;

    b. The sorrow and emotional suffering of all of Ms. Pyles's wrongful death beneficiaries;

    c.      The loss of emotional support, society, and companionship to all of Ms. Pyles's wrongful death beneficiaries;

    d.      Punitive damages (only against Defendant PrimeCare);

    e.      Plaintiff notes that any purported statutory caps or statutory limitations on the availability or amount of damages that can be awarded against Defendants, including caps on non-economic damages and caps on punitive damages, were enacted in violation of the West Virginia Constitution and are therefore invalid;

    f.      Pre- and post-judgment interest;

    g.      Attorneys' fees, costs, and expenses incurred in the prosecution of this lawsuit; and

    h.      For such other and further relief as the Court may deem proper.

**Plaintiff only seeks to recover damages from Defendant WVDCR up to but not exceeding the limits of WVDCR's applicable insurance coverage.**

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury as to all issues so triable.

                            Gregory Pyles as Administrator
                            of the Estate of Jacqueline V. Pyles,

                            By:    */s/ Anthony I. Werner*
                                  Counsel

L. Dante' diTrapano, Esquire (WVSB #6778)
Charles F. Bellomy, Esquire (WVSB #9117)
CALWELL LUCE DITRAPANO PLLC
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
T: 304-343-4323 F: 304-344-3684

William C. Forbes, Esquire (WVSB #1238)
W. Jesse Forbes, Esquire (WVSB# 9965)
FORBES LAW OFFICES, PLLC
1118 Kanawha Blvd. East
Charleston, WV 25301
T: 304-343-4050 F: 304-343-7450

Anthony I. Werner, Esquire (WVSB#5203)
JOHN & WERNER LAW OFFICES, PLLC
Board of Trade Building, STE 200
80-12th Street
Wheeling,  WV 26003
T: (304) 233-4380 F: (304) 233-4387
***Counsel for Plaintiff***

# **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **SECOND AMENDED COMPLAINT** was electronically filed with the Clerk of the Court using the CM/ECF system, on this 10th day of May, 2023, which will send notification of such filing to all counsel of record for the parties as follows:

D.C. Offutt, Jr., Esquire
Anne Liles O'Hare, Esquire
OFFUTT SIMMONS SIMONTON, PLLC
949 Third Avenue, Suite 300
P.O. Box 2868
Huntington, WV 25728-2868
*(Counsel for Defendant PrimeCare Medical of West Virginia, Inc.)*

And

William E. Murray, Esquire
Jaden P. Rhea, Esquire
ANSPACH MEEKS ELLENBERGER LLP
500 Virginia Street, East, Suite 525
Charleston, WV 25301
*(Counsel for Defendant WV Division of Corrections & Rehabilitation)*

By: */s/ Anthony I. Werner*
Counsel

L. Dante' diTrapano, Esquire (WVSB #6778)
Charles F. Bellomy, Esquire (WVSB #9117)
CALWELL LUCE DITRAPANO PLLC
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
T: 304-343-4323 F: 304-344-3684

William C. Forbes, Esquire (WVSB #1238)
W. Jesse Forbes, Esquire (WVSB# 9965)
FORBES LAW OFFICES, PLLC
1118 Kanawha Blvd. East
Charleston, WV 25301
T: 304-343-4050 F: 304-343-7450

Anthony I. Werner, Esquire (WVSB#5203)
JOHN & WERNER LAW OFFICES, PLLC
Board of Trade Building, STE 200
80-12th Street
Wheeling, WV 26003
T: (304) 233-4380 F: (304) 233-4387
*Counsel for Plaintiff*